Please be seated. Thank you for your patience. Judge, can you hear us? Judge Flipez? Yes, I can. Thank you. Thank you, Judge. Judge Montecalvo, if you'd like, I'm going to put us back on the record. Please. The next matter, number 24-1720, Mark Savage et al. versus the City of Springfield et al. At this time, would counsel for the appellants please introduce themselves on the record to begin? Arnold Lozana for the appellants, Mark Savage and Randolph Blake. If I may, I would like to reserve three minutes for rebuttal. You may. Could I ask you to pull the microphone closer? Sure. OK. So, Mr. Mark Savage and Randolph Blake are both veteran firefighters and employed at the City of Springfield. They are both African Americans. Mr. Savage is a practicing Muslim and Mr. Blake is a practicing Jehovah's Witness. This appeal arises from a jury verdict regarding their harassment retaliation cases that was tainted by four fundamental errors by the trial court. One, the district court allowed the city to argue an improper First Amendment defense to a Chapter 151B retaliatory harassment claim. The court misstated the standard for supervisory liability under Chapter 151B. The court failed to answer a key jury question that was posed to the court. And lastly, the court gave an inadequate limiting instruction regarding admitted civil service decisions. So with respect to the First Amendment issue, this trial court. Let me interrupt you and jump to your last thing you just said, because I was having a little trouble understanding your argument. So you say that the judge's failure to give a limiting instruction about the Civil Service Commission decisions misled the jury because they might think that those decisions were determinative of the issues or of the outcome in the case. But why would the jury think that? I'm sort of not connecting those dots, and I'm wondering if you could do that for me. Right. So the civil service decisions did not decide any retaliatory harassment, discrimination or retaliation claims. In fact, they went out of their way not to decide it. But the city argued in front of the jury that the credibility of the plaintiff's retaliation and harassment claims is undermined by the civil service decision, which never considered the issue. So essentially, service decisions used as impeachment of their testimony. That's what it sounded like as I read what happened. And we didn't have the transcripts. So I didn't actually get to read it yet. But that's what it felt like, is that there were inconsistent statements between the testimony at the trial and things that were reported in the civil service decision. And so the argument was something about, well, those inconsistencies should be used against them. But it didn't seem like it was because the Civil Service Commission reached this decision. You should do X. What really happened here? So what happened was at trial and during the closing arguments, the city argued that the plaintiff's harassment and retaliation claims are not credible because the Civil Service Commission found otherwise, which is just inaccurate. They never made never, never even considered those. You object to that statement in the closing because the instruction is, well, you may take the decisions into consideration, which is the civil service decisions. It remains up to you to determine whether the discipline was retaliatory. So that was said. So the argument that it seemed like you're making is it was an improper argument made in the closing by the city. Not just that it was an improper argument, it was improper instruction because it didn't clarify for the jury where there is a risk of unfair prejudice to believe. What did you want them to say other than it's up to you that that sorry, I mean to cut you off. You wanted it to say explicitly the Civil Service Commission did not decide the question of retaliation and therefore that's up to you. Right. And when the judge because the judge gave you some of the relief you wanted, like first the judge was like, no, I'm not doing anything about this. And then came back and said, I'm going to do something about it. Did you object to say, well, what you're proposing to do is not enough? It doesn't go far enough because it still leaves the jury with the opportunity to give too much weight to the civil service decision regarding the fact issue that the jury is assigned to resolve, which is whether or not there was harassment or retaliation. So essentially, it appears that the city is arguing is some kind of issue preclusion here. But if the Civil Service Commission never considered the issue, then obviously it wouldn't have any preclusive effect here. So therefore, with the risk of prejudice with a jury assuming, all right, they're arguing that the civil service addressed this when the fact they didn't is that's where the error lies. Right. The instruction, the failure to give a more clear instruction kind of created a path for the city to. The problem was it allowed the city to make what you just called an issue preclusion argument that they never should have been able to make. Right. Right. Right. And and the city did what the court gave it an opportunity to do so. But you did not object to the argument when they made it. I did not object to any of their closing arguments. And it's kind of red herring there. Sometimes you draw more attention to the issue. But we certainly preserved it during the trial. Is there another issue you would like to go to or would I? I know you wanted to talk about the First Amendment. Yes. So I can get back to the First Amendment. So the trial court evidence included 20 highly offensive social media posts by both supervisors and employees. The city argued in their closing that the posts were constitutionally protected political speech. This included posts portraying Muslims as inherently dangerous. Looks like what the city. And I read this part of the closing argument. What it looked like to me was happening is the city is saying these are, you know, Joe Conin is saying these are bad posts. There's absolutely no question about that. I have no doubt about that in my mind. But the question for me is this person in a high level role at this fire department is what can I do about it? Because there is a First Amendment component to even speech that we dislike. We all know that. So we'd like we dislike this speech. But what can we do about it to punish the people who are doing it? That's complicated. I need to talk to H.R. H.R. has to help me through this thicket. And that's different than this is, you know, the city just said, oh, forget it. This is their First Amendment rights. I mean, it doesn't seem to me that that they're arguing this was showing responsibility of the person, high level person in the fire department to realize there are conflicting things going on. And I have to figure out my way through a very tricky employment slash First Amendment situation. And if that's what the argument was, why is that a bad argument? That seems like a fair thing to want to say about what happened. Yeah, well, that's not what the argument was. The argument that the city made specifically after Mr. Pakula acknowledged these are offensive, disturbing and upsetting. He was allowed to argue, but that's my right to political speech. He's centering before the jury. A legal question. That's the Pickering analysis to say you can balance the states said it's my right to say that. Attorney Pakula. On day eight, page 32. Paragraph 19 through 20. And that is wrong as a matter of law. The Farragut versus city of Boca Raton case makes clear the First Amendment does not override the protections of anti discrimination laws. The city was essentially presenting a Pickering style harassment test to the jury, essentially asking the jury to weigh First Amendment concerns against the public interest in protecting employees from workplace harassment. This balancing test is a legal question for a judge, not a jury. The judge was given opportunity to address it and asked to preclude the city from making this argument. And the judge decided not to. And therein lies the error. Since the First Amendment argument involves a clear area of law, that portion of it is reviewable de novo. Look also during the closing argument. The. City said, you know, we're living through an experiment with social media colliding with the First Amendment, colliding with hate speech. Again, centering the First Amendment argument before the jury, who, quite frankly, is not equipped to do a First Amendment analysis. That's why we have we asked the court to do it so they can take into account all the complicated factors that go into addressing the Pickering factors. I guess I'm reading from the same area. It's not saying there is a First Amendment right. It's saying there's a convergence of things happening here, which is people outside of work are writing things on social media. They work here. Those things are having an effect on people who work here. That's problematic for the reasons you just talked about. And I, Joe, am a boss here and I am like not a lawyer. And this is all really hard. And so I'm going to ask HR this guy, Dan, and Dan's going to do work. And at the end of it all, I have to do something. And that seems to all shed on like was it retaliatory or was it an effort to make my way through something that's pretty awful and difficult? And to me, you'd want to tell the jury jury this wasn't retaliation for what they did. This was my that I didn't act in the way to remedy this, that they that they say I should have. It was my best efforts in a really hard situation. And to explain that to the jury, you would have to explain here's the First Amendment stuff that's going on. And at least that part that I'm reading seems like that's what it was about. That might be useful way to look at it if there were affirmative defenses at play, which there aren't under under Chapter 151 B under. Right. So and so with Chapter 151 B, the court gave an erroneous jury instruction regarding supervisory liability. Under Massachusetts law, when supervisors are involved in harassment, there's strict liability. Does this come down to whether it's your supervisor versus a supervisor? A supervisor. And that is that the I mean, is that the dispute here? Yes. Yes. You would say it's a supervisor. They're going to tell me it's the supervisor. Right. Right. But I think the law is clear that it is a supervisor. And if you look at a case about that called. Yes. Yeah. So Noviello, which was decided after the before the Seward case, speaks to this issue. But this is a retaliatory harassment case. And this court abrogated Noviello in the context of retaliation cases that that's in the case of Stafford versus Bentley University. Stafford versus Bentley University, I'll give you the exact site in a moment. But yes, that's no. Sorry, I misspoke. A Stratton Stratton versus Bentley University, 113 at 425. And the court said Novello standard in retaliation context is no longer appropriate. And we are dealing with a retaliatory. I'm sure Noviello said other things. Yeah. Who's a supervisor? Yes. But part of part of the problem with and I'll just wrap up and answer your question. Noviello was decided before Burlington Northern, which adjusted the analysis for deciding what constitutes adverse action for disparate treatment versus retaliation cases. And they didn't take into account, even though Noviello was dealing with a retaliatory harassment case, it didn't take into account the principles that were established in Burlington because they hadn't been decided yet. So and I think that was one of the reasons why this court abrogated Noviello with respect to retaliatory retaliation cases, because it didn't take Burlington into consideration. I thought we clarified in Stratton, but I think Judge Lopez probably has that one since he wrote it. Your time is up, but I just want to ask Judge Lopez if he has any more questions. You give me too much credit for remembering something that I wrote. Thank you. But I do. I do have a question. Sure. Counselor, early in your argument, you you said that. The posts were done both by supervisors and other employees. Is it your position that the record established that some of the posts were, in fact, done by supervisors? Absolutely. Okay. Excuse me. Go ahead. I'm sorry. I just want to make sure I understand what we're talking about. I agree that the supervisors who were on a long list of folks who made posts were not directly. They weren't the direct supervisors of my clients, but they did have supervisory authority in the organization that they could exact against my clients. Springfield Fire Department is a paramilitary structure where every supervisor is empowered to initiate disciplinary actions against anyone who violates a department policy, including the policy against harassment and discrimination. Every supervisor has that authority, and they can, in fact, initiate discipline against any of my clients. And they have in the past, despite the fact that they were not the direct supervisees. So with this kind of modicum of supervisory authority, the 151 B liability will attach. The strict liability will attach. Okay. So that's really a critical point from your point of view. If the law is, as you say, the supervisors do not have to have direct responsibility over the individual suing. If they can exercise some authority, even in a more general way, that's enough. This instruction is just plain wrong as a matter of law, right? Because it seems to assume that the postage were done only by people who were not supervisors. And that's just not factually supportable in this record. That is absolutely correct. And then the courts are leaning on the Novello case, which again was decided pre-Burlington. That case dealt with both a 151 B and a Title VII case. And it kind of leaned towards describing supervisory authority in a way that was more consistent with Title VII than 151 B. The Sewer case that followed Novello took Novello fully into account, actually cited it several times, and made clear that the construction of supervisory authority under 151 B is much broader. This case was dealing solely with a 151 B claim, so they were able to go deeper into that analysis. We presented Sewer to the trial court, and we think that that should have been the standard that guided the instruction. And the court decided otherwise. For the benefit of opposing counsel, I think this is a critical issue to address. Because speaking only for myself, if this instruction was erroneous in the way that it's being argued, I find it hard to see how it could be a harmless error. So I hope opposing counsel will address all of that. Thank you. Thank you. Thank you, counsel. At this time, counsel for the appellees, please introduce himself on the record to begin. Good morning. I think it's still morning. Edward Pakula on behalf of the appellees. Addressing the issue that just came up, I think the confusion comes to the forefront because of two issues. One, the only claims that went to the jury were under 151 B on the state claim, no other claims. Number two, the standard that Mr. Lozano is arguing for is one of strict liability, which only applies with regard to a direct supervisor. There can be supervisors who do not exercise actual authority, and those are not strictly liable. Those are ones where there needs to be some showing that they have exercised. There's a distinction you were drawing, which I can be a manager, but I'm not your manager. Correct. If I harass you, what you're telling me is that's as if I'm just a co-worker. It's a certain line of analysis. If I am your supervisor and I harass you, it doesn't matter if you report it. It doesn't matter what the company did. The company is responsible for what I did. Correct. That's the framework. The only caveat to that is if I'm a supervisor of other people, but I exercise actual authority over you, even though I don't have that over you, or even if I may be able to under some rules or regulations do that, what they look at is did they actually exercise authority over that person? The answer is no. There was no evidence in the record that any of the posters had ever exercised any actual supervisory authority over these people. You described how they could. Is that wrong? Potentially, but the issue is not that. That at the trial? Yes, there was evidence that they potentially could under certain circumstances. Why would it be potentially could be the thing? Because the idea is it's the nature of our relationship. So I have this ability to harm you. I may use it. I may not, but I can. Why should it be whether I did harm you? No, no, no. The example that he used to say that they have authority is that while they're all supervisors and all supervisors have a duty to intervene, that's the example he's using. The rules and regulations say supervisors. Not all people who are supervisors have the ability to write you up for misconduct. Well, a coworker could write you up for misconduct. I give you a warning. Not that it would have any disciplinary effect at all. No. And any warning, any sort of write up requires some sort of a disciplinary hearing before someone who has the ability to adjudicate that. But just because I have the name supervisor, the case laws actually say it's not the nomenclature of being a supervisor that controls. It's the actual exercise of supervisory authority that controls. And there is no evidence in the record of that ever happening at all. What do you mean by exercise? Well, did they ever hold themselves out to be a supervisor of either of these individuals? And if you look, all of these posters, although some of them did hold ranks, most of them equal, not over and above, but just at the same level. None of them ever exercised any sort of supervisory authority over either of these plaintiffs. And it is that actual exercise of authority or direct supervision that we have to look at, not the labels. Because on an org chart, these people would be on a parallel line.  Because they're on a parallel line, you're saying they're not supervisors of the people below them, but they're not supervisors of the people on their line. Correct. They did not exercise any actual authority, nor did they attempt to exercise their actual authority. So the jury instruction is correct. It's correct under Collegetown, which is the leading case under 151B. And it's correct under all of the other cases. The Stratton decision was not cited by the plaintiff in any of the briefs or in any of the replies. If I may, I would suggest I could submit a letter post-argument as to the Stratton issue.  I think that's one minor point here that we get back to. I mean, that's his last argument. And clearly, the judge followed all of the case law that was available as to supervisory liability. As it exists in the Collegetown, as it existed in Noviello, as the Stratton. As I said, that was not addressed in the briefs, and I will submit a further letter on that. But as to the First Amendment issue, I think it's almost exactly as you described. There was some context of First Amendment confusion, complexity, some sort of application that someone's going to raise that sort of issue that leads to the commissioner asking for assistance. And Attorney Talia Gee came in and provided that assistance. And where there was discipline was appropriate, it was meted out. Where there was some appropriate warnings given, the behavior stopped. These posts were not and have not been continually going on. They stopped once the fire commissioner got together with HR and the attorney to address these inappropriate. There's a reference that he makes to comments that I made, which, again, were not implying that everything was protected. It was trying to put in context here why Mr. Conant requested that this was a complex issue. Attorney DeSouza, the other lawyer, brought up specifically saying, we're living in these times. I'm asking you not to focus on the First Amendment issue. She asks, she says in her argument, if you read it, I'm asking that you focus on whether the process was reasonable. And that is the standard, is whether they addressed it appropriately. And that did happen here. And that's borne out by the fact that this behavior, they got to the bottom of it and stopped it. And it wasn't based on any one saying to a jury that this would protect it. As to the civil service question, the additional instruction that Mr. Lozano requested was to add the fact that discrimination was not addressed. Not just retaliation, because the judge did say, it's up to you whether this is retaliation. Didn't use the word discrimination. Well, the issue of disparate impact, discrimination, was not submitted to the jury. Still don't follow. Can you just explain to me the admission of the civil service? What was the purpose of them? Why were they admitted? There was no question as to their admissibility under the case law. They are binding as to the fact that the discipline, and that was the argument he was trying to make, is that somehow. At least I understand the record. They're introduced by you during the redirect. They're asking questions about something about the civil service thing. So you didn't introduce them on the cross. And then you stand up and you want to introduce them. Why? Why do you want to introduce them at that? Because they opened the door. They started talking about the decisions and criticizing the decisions and saying they were wrong. And the judge said, well, Mr. Lozano, you've opened the door. And that's how. What is the irrelevance? If they're not deciding to be. Because they're binding on the fact that the discipline was appropriate. That doesn't change the fact of, wait a minute, are you doing this for retaliatory purposes? But the arguments that they were making was the civil service decisions shouldn't have imposed any discipline. And I said, wait a minute. You know, these are binding. This is binding. There's precedent that says these are binding. They're designed to show that at least the civil service to the rules of the civil service. This was lawful discipline.  If they were retaliatory for because you complained about a discrimination, then that's just a different issue. But you're saying they were challenging just decisions themselves, the civil service decisions themselves. And that's what opened the door. And the judge, that's the that's the colloquy that the judge does it. You thought they were irrelevant until the moment they called them into. She wasn't going to have them go in until they opened the door. That was the situation. Criticizing or downplaying them. Excuse me? By criticizing or downplaying those decisions.  I may just have a moment. The last one is the the the evidence that the judge didn't tell them what the evidence was. Oh, yeah. The that was handled appropriately in terms of the jury and the jury question. It was not a jury question of could we hear the testimony of so and so again? It was a question of what was the evidence of the year that Mr. Blake was on a civil service list. And could they have deterred the testimony again? I mean, my experience is there are no transcripts. There was no transcript. It would have involved the judge calling through some recordings and somehow ordering some recordings to be transcribed or somehow arranging logistically for the jury to listen to testimony again, which Mr. Lozano was referring to. But even what he referred to was not directly on point. It was merely Mr. Blake saying, well, there was a period of time from 2016 to 2018 when I was on the civil service list and I was number two behind some other people. But they weren't residents. And the issue of residency and that playing into this was a whole nother litigation matter in the state court that had no relevance as to what was going on here. That's essentially the situation. I'll be happy to answer any other questions. Judge Lopez, do you have any questions? Yes. Thank you. Counsel, focusing on this jury instruction about supervisory liability. In the very first line, the jury is told by the judge, the city is also liable for discriminatory acts done by others. The focus immediately is on what others did, not at all on what the supervisors themselves did. The supervisors on that theory can only be liable for what they knew or should have known about what others were doing and how they responded to it. Your opponent writes in his brief, and I'll quote this for you. At the Springfield Fire Department, supervisors, and again, there seems to be no dispute that a number of the people posting here, four or five, perhaps six of them were supervisors, were mandatory reporters of harassment and had a duty to report when they observed such harassment. They were therefore empowered to protect all employees from harassment. Given that supervisors themselves were involved in this harassment, it seems clear that they were not fulfilling that duty to protect all employees from harassment. To the contrary, arguably, they were participating in the harassment. And yet, this instruction does not tell the jury that they are supposed to consider what the supervisors themselves actually did in terms of harassment. They're only supposed to consider if they can be liable for what others did. I mean, how do you justify that instruction in light of what seems to be the unmistakable record in this case about what the supervisors themselves did? I think you're taking one part of the instruction alone, but if you look at the instruction as a whole, you'll see that it comports to all of the precedent, all of the case precedent and all the jury instructions that were given in cases comporting with what a trial judge is supposed to do when it comes to instructing a jury on supervisory liability. But if you take that one, I believe it's somewhat out of context. I think that the issue here is, again, retaliation, not discrimination, was the issue. There were no discrimination cases, claims that went to the jury. Well, if supervisors, instead of fulfilling what your opponent says was their responsibility for protecting from other employees from harassment, and instead they participated in themselves, why couldn't a jury infer that their very conduct reflects a retaliatory motive? Because it's not the nomenclature that controls. The nomenclature of being a supervisor really doesn't matter. What controls is their actual authority in terms of what they held themselves out and expressed, and there is no evidence that they ever had any direct supervisory authority over these individuals or held themselves out to be as such. OK, thank you. I mean, even if their job, one of their job duties is to be someone responsible for intervening and stopping harassment. So you're a supervisor. Here's your panoply of jobs. One of them is, I'm the employer. You are on my front line to deal with harassment. That doesn't make you a supervisor for the purpose of 151B if you are then the harasser? In name, it does. Well, it seems like it's more than name. That's your job. That's your responsibility. Actually, the posts, as offensive as they were, were not directed at these individuals. They were Islamophobic. That's for the jury to decide whether that's correct or not. Correct. And that's what the judge instructed. It's been changed in by a supervisor whose one basket of supervisory responsibilities is to be the front line to deal with harassment. And now they are arguably, a jury could find, the harasser. And you're still saying, even though that's true, they are not the supervisor in the way we mean it, which I take you mean is the person who can fire you or start that process or whatever it is in the fire department. Those sort of give you job tasks to do. It's only those things, not this other thing, which is to be responsible for sort of stopping harassment. Well, under that definition, anyone who has the name supervisor would be liable, but would not be strictly liable. That is, I think, the key here, is trying to equate strict liability with the notion of a jury question as to whether it was, in fact, retaliatory. And the jury here said no. Thank you. Your time is up. Thank you, counsel. At this time, would counsel for the appellants please reintroduce himself on the record? He has a three-minute rebuttal. Arnold LaXanna again for the appellants. So just to address a few matters that Mr. Bakula raised. I was surprised to hear him acknowledge that the supervisors that he was asked about actually have the ability to initiate disciplinary action, and he's making that distinction between what they have the ability to do and what they actually did. Authority speaks to what you have the ability to do, not what you did. Or what you want to do is what you have the actual authority to do. Every supervisor in the Springfield Fire Department has the authority to initiate discipline against a member of the fire department based on the rules and regulations of the department under Article 17. It's a requirement. So for them to participate in the harassment and then look the other way as their other supervisors are involved into it is a serious abrogation of their supervisory authority. It's not the normal workplace. It's clearly a highly regulated workplace. I'm thinking probably of a company, and this is not. So what does that mean? I initiate discipline. I as a supervisor can initiate discipline of anyone. So I see a subordinate, a lower-level person than me, who on a day-to-day basis I am not in charge of, but I see them not clock out, like do something they shouldn't do. What can I do as that? I'm not their day-to-day. They don't report to me every morning, but I see them engage in misconduct, and I am a supervisor. What is it in this workplace that happens? So in the context of the Springfield Fire Department, you can bring the offending individual up on charges, which requires a paperwork process, and you have to communicate your concerns about the harassment in writing to the fire chief as to go up the chain of command. This is very paramilitary sort of format. I'm an Army veteran. I had to learn this the hard way as a private, you know, that pretty much anyone above your rank or even sometimes people at your rank have the ability to initiate a concern about you, which could result in disciplinary action. That's the environment that we're working in here. Is discipline always imposed by some kind of board or panel? Ultimately, it has to go up the chain of command. You do have the right of appeal. You can go to the Civil Service Commission or something like that, but it is a substantial amount of authority as a supervisor to be empowered to initiate discipline. And then in the context of – and I think what 151B tries to anticipate is that the power that a supervisor is clothed in facilitates their ability to harass people because you've got three supervisors that we've named in the record who were actively involved in the supervisor harassment. That gives a permission structure for everyone else to do it, and everyone else did. Roughly about 15 employees were doing the same thing. It seems like this – some of this may hinge on how this works in the Springfield Fire Department. Take, you know, the restaurant at the end of the block, and I am a server, and there's a supervisor of servers, and then there is a procurement department that gets the food. Just another department of the restaurant, and there's a boss of that. And I'm a server, and my chain runs up to the head of servers, and they're the one who disciplines me. If that other boss is in a totally different line, and they don't fire me, they can't do anything to me, if that person harasses me, how does Massachusetts law work? The Massachusetts law doesn't require you to be a direct supervisor of the plaintiff or the complaining party, just that you have supervisory authority in the organization. Over anyone, so if that person only has supervisory authority over the other procurement people. Right. To be precise, it says that actual and apparent authority. So you don't have to show that you actually did anything to anyone, as long as you're clothed with the authority to initiate some kind of action in the organization. In the organization, not against the complaining person. Against the complaining person. Yeah, that's the way you facilitate the retaliation. You use your authority to get back. And what we're talking about is all the supervisors that we're talking about who posted material were all upset because the plaintiffs complained about discrimination with respect to enforcement of the residency law. And they all had a lot to lose by the city enforcing the residency law. So that's where the retaliatory nature comes from. Okay. Judge Lopez? Thank you. Nothing more. Okay. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.